## UNITED STATES v. HICKS.

(District Court, W. D. Kentucky. April 3, 1919.)

1. STATES ⬦4—CONGRESSIONAL POWERS—POWERS REMAINING IN STATES.

Suppressing disorderly houses, etc., ordinarily comes under the police power reserved to the states by Const. U. S. Amend. 10, and is not within the legislative power of Congress, except in time of war or other great public peril.

2. WAR ⬦33—TERMINATION.

The President's declaration to Congress that the war ended on November 11, 1918, will be accepted as prima facie correct until events show the contrary, so that Act Cong. May 18, 1917, § 13 (Comp. St. 1918, § 2019b), authorizing the suppression of disorderly houses around encampments "during the present war," is inapplicable to an offense committed after November 11, 1918.

3. EVIDENCE ⬦83(1)—PRESUMPTIONS—PRESIDENTIAL DECLARATION.

All citizens may be presumed to have been informed of, and to have relied on, the President's declaration to Congress that the war ended November 11, 1918.

4. CRIMINAL LAW ⬦905, 966—NEW TRIAL—MOTION IN ARREST—TERMINATION OF WAR.

Since events may subsequently prove the President's declaration to Congress that the war ended November 11, 1918, to be inaccurate, one convicted of violating in December, 1918, Act May 18, 1917, § 13 (Comp. St. 1918, § 2019b), authorizing suppression of certain disorderly houses "during the present war," will be granted a new trial, instead of arresting judgment.

Harry Hicks was convicted of operating a house of ill fame. On motions for arrest of judgment and new trial. New trial granted.

Perry B. Miller, Dist. Atty., and S. M. Russell, Asst. Dist. Atty., both of Louisville, Ky., for the United States.

Clem W. Huggins and Joseph E. Conkling, both of Louisville, Ky., for defendant.

WALTER EVANS, District Judge. The indictment in this case charges:

"That heretofore, to wit, on the 7th day of December, in the year of our Lord 1918, at Louisville, in said district and within the jurisdiction of this court, one Harry Hicks, late of said district, unlawfully did then and there receive and permit to be received for immoral purposes certain persons into a place used for the purpose of lewdness, assignation, and prostitution, within the distance of a military cantonment designated by the Secretary of War; that is to say, that said Harry Hicks did then and there receive and permit to be received for immoral purposes both men and women, whose names are to the grand jurors unknown, into a place operated as a house of ill fame, designated as 401 Seventh street, Louisville, Ky., and within five miles of a military cantonment, to wit, Camp Zachary Taylor, and used for the purpose of lewdness, assignation and prostitution, and did then and there keep and set up a house of ill fame as aforesaid, in violation of section 13 of the act of May 18, 1917, and the order, rule, and regulation of the Secretary of War, issued to carry out the object and purpose of said section of said act."

The defendant entered a plea of not guilty and also a plea that he had previously been convicted of the offense charged in this indictment on a similar indictment therefor in a state court in Louisville, and had

paid the fine imposed by the judgment rendered in that case. The latter plea not being regarded as sufficient in law—the jurisdiction of the two courts being conferred by separate governments which had made separate and distinct laws upon the subject—the case came to trial before a jury on the plea of not guilty. The testimony showed that on the 7th day of December, 1918, the defendant had done the things charged in the indictment, and that the place at which those things were done was within five miles of the boundary line of Camp Zachary Taylor adjoining that city. The jury returned a verdict of guilty.

[1] The defendant has moved, first, for a new trial, and, second, that judgment on the verdict be arrested, upon the ground that the facts proved did not show that any offense had been committed against any law of the United States. By the latter motion there is raised an interesting and important question, which has received the very careful consideration of the court, because, however disgusting the conduct of a person may be, the courts of the United States cannot punish that conduct as criminal unless there be some specific statutory law of the United States authorizing and requiring it. Accurately speaking, the conduct of the defendant is of that character which ordinarily could only come under the general police power constitutionally reserved to the states by the Tenth Amendment, and is not within the legislative power of Congress, except in time of war or other great public peril, that might be averted or mitigated under the commerce clause of the Constitution. These phases of the law should not be overlooked in cases like this. In this connection, and to illustrate our meaning, it will suffice to state the general proposition in the language found on page 473 of volume 9 of the Encyclopedia of United States Supreme Court Reports, where it is said:

"The general police power is reserved to the states. The power to protect the public health and the public safety, to preserve good order and the public morals, to protect the lives and property of their citizens, 'the power to govern men and things' within the limits of their dominions, by any legislation appropriate to that end and which does not encroach upon the rights guaranteed by the national Constitution, nor come in conflict with the acts of Congress passed in pursuance of that instrument, is a power originally and always belonging to the states, not surrendered by them to the general government, nor directly restrained by the Constitution of the United States."

This is supported by a great number of notable cases.

[2, 3] But, without further going into those matters, it will suffice to say that there is no statute of the United States applicable to this case, unless it be the provisions, presently to be inserted, of the act entitled "An act to authorize the President to increase temporarily the military establishment of the United States," approved May 18, 1917 (Act May 18, 1917, c. 15, 40 Stat. 76).

Under the Constitution of the United States (article 1, § 8, cl. 11), Congress is authorized to declare war, by clause 12 to raise and support armies, by clause 14 to make rules for the government of the land and naval forces, and by clause 18 it is empowered to make all laws which may be "necessary and proper" for carrying into execution the powers given in that article and all other powers vested by the

Constitution in the government of the United States or any department or officer thereof.

We may assume for the purpose of this opinion that section 13 of the act referred to (Comp. St. 1918, § 2019b) covered a legitimate exercise of the powers of Congress. Although there is no express provision in that section which authorizes the Secretary of War to make regulations to meet the exigencies of the section, we may assume (without deciding) not only that such regulations were made, but that they conformed to the provisions of the act. We may also assume that Congress had concluded that the legislation to be referred to was "necessary and proper" to carry into effect the other powers authorized to be exercised in the great emergency of war that had a few days before come upon the country.

By a joint resolution passed by Congress and approved by the President on April 6, 1917, it was resolved:

"That the state of war between the United States and the Imperial German government which has thus been thrust upon the United States is hereby formally declared; and that the President be, and he is hereby, authorized and directed to employ the entire naval and military forces of the United States and the resources of the government to carry on war against the Imperial German government; and to bring the conflict to a successful termination all of the resources of the country are hereby pledged by the Congress of the United States." 40 Stat. 1, c. 1.

This situation, in the judgment of Congress, required much legislation. Among the acts it passed was that approved May 18, 1917, the thirteenth section of which is as follows:

"That the Secretary of War is hereby authorized, empowered, and directed during the present war to do everything by him deemed necessary to suppress and prevent the keeping or setting up of houses of ill fame, brothels, or bawdy houses within such distance as he may deem needful of any military camp, station, fort, post, cantonment, training, or mobilization place, and any person, corporation, partnership, or association receiving or permitting to be received for immoral purposes any person into any place, structure, or building used for the purpose of lewdness, assignation, or prostitution within such distance of said places as may be designated, or shall permit any such person to remain for immoral purposes in any such place, structure, or building as aforesaid, or who shall violate any order, rule, or regulation issued to carry out the object and purpose of this section shall, unless otherwise punishable under the Articles of War, be deemed guilty of a misdemeanor and be punished by a fine of not more than $1,000, or imprisonment for not more than twelve months, or both." 40 Stat. 83.

Events of greatest moment continued to follow, and early in the month of November, 1918, the military power of the enemy collapsed. In no part of our history did anything arouse more universal interest among the people of the United States than did this situation.

Article 2, § 3, of the Constitution provides that the President "shall from time to time give to the Congress information of the state of the Union, and recommend to their consideration such measures as he shall judge necessary and expedient." For much the greater part of the existence of our government the method of complying with this constitutional requirement has been by what we are accustomed to call the "messages of the President." The President of to-day (as he law-

fully might) has used another method of giving to the Congress such information as he thought it wise to communicate; his method being to request the two houses of the Congress to meet in joint session, and, when that is done, to make his communication orally, and in this way meet the constitutional provision. In substance both methods are precisely the same. And so on November 11, 1918, Congress, knowing of his wishes, adopted the following joint resolution, viz.:

"Resolved by the House of Representatives (the Senate concurring), that the two houses of Congress assemble in the hall of the House of Representatives on Monday, the 11th of November, 1918, at 1 o'clock in the afternoon, for the purpose of receiving such communication as the President of the United States shall be pleased to make to them."

Accordingly the two houses assembled in joint session in the hall of the House; the President appeared at the Speaker's seat, and gave to Congress information of the state of the Union in respect of the war it had declared on April 6, 1917. Having read to the Congress thus assembled the 34 terms stipulated in the armistice agreement entered into a few hours before and signed by the representatives of the German army, the President said:

"*The war thus comes to an end;* for, having accepted these terms of armistice, it will be impossible for the German command to renew it.

"It is not now possible to assess the consequences of this great consummation. We *know only that this tragical war,* whose consuming flames swept from one nation to another until all the world was on fire, *is at an end,* and that it was the privilege of our own people to enter it at its most critical juncture in such fashion and in such force as to contribute in a way of which we are all deeply proud to the great result. We know, too, *that the object of the war is attained,* the object upon which all free men had set their hearts, and attained with a sweeping completeness which even now we do not realize. Armed imperialism, such as the men conceived who were but yesterday the masters of Germany, is at an end, its illicit ambitions engulfed in black disaster." Congressional Record of November 11, 1918, and Official U. S. Bulletin, also of that date.

The question now to be decided is presented in this way: The acts charged in the indictment and claimed to constitute an offense against the United States were committed and done on December 7, 1918, at least 25 days after the President's communication to Congress had been officially and most conspicuously made declaring that the war "*is at an end.*" Were the acts of the accused committed "during the present war" within the true meaning of that phrase as used in the section of the act upon which the government seeks to maintain the indictment and the conviction thereunder? Upon the proper answer to that question depends the authority of the court to inflict punishment upon him.

At the hearing it was urged on behalf of the United States that Congress alone can begin war, and consequently that Congress alone can terminate it. But that does not follow, for the Constitution, while in express terms giving Congress the sole power of declaring war, in no way so expresses itself as to give that body any authority itself to terminate it. And so in this instance, while Congress has not itself declared the war to be ended, in its presence the President—also the commander-in-chief of the army—did officially communicate to Con-

gress the fact that it "is at an end" upon the momentous occasion referred to and in the explicit terms we have given, and information of all the details of which no doubt reached our entire population, including the person now under accusation, and all of whom might act upon the assumption that this official statement of the President was true.

The authoritative publications show that, while war is usually terminated by a treaty of peace, and that such treaty is the best evidence of such termination, history shows many instances in which wars were terminated without any treaty at all. Notably this must be so in domestic wars. So it is also where a complete conquest of the weaker nation leaves no one authorized to make a treaty. The public is oftentimes, perhaps generally, notified of treaties by official proclamation. But there is no prescribed form for such latter documents, and at last they are but official announcements of a state of fact. The President's official communication to Congress met all the conditions of an official proclamation, so far as such documents are designed for giving information. It was made on a notable occasion; it was made upon a theater that attracted the attention of all the people of the United States, and indeed of the civilized world. The purpose of the President's oral message being to communicate information, it, if true, met the requirements of the question before us. Was that information accurate, or were the facts perverted? Does it now lie in the mouth of the government, in this prosecution made in its name, to insist that it was false, even if there is nothing like a technical estoppel?

Undoubtedly, if there be any doubt about it, a completely ratified treaty of peace is the best evidence of the termination of a war; but as we have said such a treaty is not essential to the actual ending of a war, as has many times been demonstrated. Indeed, there is no formal or ceremonious way agreed upon in international law or otherwise for ending a war. Circumstances govern such situations, and here, as we have seen, they raise a most important, if not vital, question of fact, namely: Was the 7th day of December, 1918, "during the present war?"

For reasons more or less publicly known, no treaty of peace has yet been made; but it is claimed that actual war was nevertheless in fact ended last November, and the statement of the President, officially made and acclaimed on the 11th day of that month, and which met with quite universal acceptance by the people, is as effective in showing the fact of the actual termination of real war as would be the case with a treaty. In advance of a treaty it is, of course, possible for the war to break out again; but, if it does not do so, then certainly it was *in faci ended*. If the announcement of the President was true and correct, then the 7th day of December, 1918, came after the war was at an end, and was not "during the present war," as that phrase is used in the statute under which this prosecution was begun. The accuracy of this proposition would seem to be obvious.

Again, the President's official statement was either true or it was mere rhetorical optimism. This court is by no means at liberty to yield to the latter alternative, for it is clearly of opinion, in view of cur-

rent public history, that the President's statement was, in fact, correct when made, even if an agreed upon treaty of peace has been delayed in the making.

Every citizen of the United States, the defendant included, may well be presumed, first, to have been informed of the substance of the declaration made by the president, and, second, to have relied upon it as true. Probably all accepted it as correct, and rightfully acted upon it as being in fact true. Hostilities ceased, not a gun has since been fired, the demobilization of our troops is in active progress, and much acclaimed peace negotiations have been under way. Under these circumstances every person in the country had the right to accept the President's official declaration as true, and to act upon it, and especially if it affected the question of whether certain acts were criminal or the reverse. Here most reprehensible conduct was made criminal only if committed "during the present war." When the war came to "an end," so did the thirteenth section of the act of May 18, 1917, for, if the President's notable declaration was true and correct, the 7th of December, 1918, we repeat, was not "during the present war." That date, in those circumstances, was after that statute had ceased to be a law of the United States, in which case the acts alleged in the indictment could only be punished under the law of the state.

After it had declared war, Congress found it necessary to enact much war legislation, and provided in each act for a more or less extended period for the operation of its provisions, and doubtless undertook to make the length of that existence depend upon what it deemed the necessities of the subject-matter—the limitation fixed in the thirteenth section of the act of May 18, 1917, presumably being based upon the Tenth Amendment of the Constitution. Possibly the most restricted continuance of such legislation was that fixed in the section involved in this case. A more detailed examination and search than is now deemed at all necessary might show in the so-called war legislation a great variety of phraseology used in fixing the circumstances and contingencies upon which its operation would come to an end; but all the while, and in respect to all such legislation, it must be presumed that Congress expressed itself exactly as it preferred in respect to each subject-matter. The extremes of this would probably be shown on the one hand in the phrase "during the present war," used in section 13 of the act of May 18, 1917, and on the other in the quite intensive phraseology of clause 4 of section 1 of the act entitled "An act to enable the Secretary of Agriculture to carry out during the fiscal year ending June thirtieth, nineteen hundred and nineteen, the purposes of the previous act entitled 'An act to provide further for the national security and defense by stimulating agriculture and facilitating the distribution of agricultural products,' and for other purposes" approved November 21, 1918 (40 Stats. 1046, c. 212), which is as follows:

"That after June thirtieth, nineteen hundred and nineteen, until the conclusion of the present war and thereafter until the termination of demobilization, the date of which shall be determined and proclaimed by the President of the United States, for the purpose of conserving the man power of the nation, and to increase efficiency in the production of arms, munitions, food, and clothing for the army and navy, it shall be unlawful to sell for beverage pur-

poses any distilled spirits, and during said time no distilled spirits held in bond shall be removed therefrom for beverage purposes except for export. After May first, nineteen hundred and nineteen, until the conclusion of the present war and thereafter until the termination of demobilization, the date of which shall be determined and proclaimed by the President of the United States, no grains, cereals, fruit, or other food product shall be used in the manufacture or production of beer, wine, or other intoxicating malt or vinous liquor for beverage purposes. After June thirtieth, nineteen hundred and nineteen, until the conclusion of the present war and thereafter until the termination of demobilization, the date of which shall be determined and proclaimed by the President of the United States, no beer, wine, or other intoxicating malt or vinous liquor shall be sold for beverage purposes except for export. The Commissioner of Internal Revenue is hereby authorized and directed to prescribe rules and regulations, subject to the approval of the Secretary of the Treasury, in regard to the manufacture and sale of distilled spirits and removal of distilled spirits held in bond after June thirtieth, nineteen hundred and nineteen, until this act shall cease to operate, for other than beverage purposes; also in regard to the manufacture, sale, and distribution of wine for sacramental, medicinal, or other than beverage uses. After the approval of this act no distilled, malt, vinous, or other intoxicating liquors shall be imported into the United States during the continuance of the present war and period of demobilization: Provided, that this provision against importation shall not apply to shipments en route to the United States at the time of the passage of this act."

But in no event can the contention made at the argument that section 13 of the act of May 18, 1917, should be so construed as to continue its operation during the demobilization at Camp Zachary Taylor be sustained. No criminal legislation (to which strict rules of construction must be applied) could properly admit of the latitudinous construction thus contended for. The language of section 13 is plain, explicit, and unambiguous, and contains no provision in respect to demobilization nor anything resembling it.

To summarize: The act of May 18, 1917, made criminal certain immoral conduct if committed "during the present war"—of course meaning the war with Germany, which, a few weeks before, had been declared by Congress. The limitation distinctly specified by Congress for the continued operation of this criminal legislation was expressed in the words just stated. This limit thus fixed was not the making of any treaty of peace, nor its ratification, nor the mustering out of the troops making up our army. In fixing the time of continued operation of the act Congress used the words "during the present war." This does not appear to be a case for technicalities, but for facts. If the war in fact had ended on November 11, 1918, it did not continue until the following December 7th. We know the war began on April 6, 1917 When did it end? On November 11th, as we have stated, the President communicated to Congress the express information that this "tragical war * * * is at an end." This status, then ascertained and communicated to the Congress by the chief of the executive and of the military service of the United States government, should, we think, be accepted as accurate and final by the court in this case

[4] In our view the statement made by the President on November 11, 1918, must at the very least be received and treated as prima facie true in the present status of this case, though facts may possibly develop to show the contrary. In view of such possible developments

of fact, we have concluded it to be best to overrule the defendant's motion in arrest of judgment, but to sustain his motion for a new trial. If at the next term a new trial shall be had, an instructed verdict of not guilty can be asked, and the same might be given, if nothing then appeared to demonstrate the inaccuracy of the President's statement. This remark, however, should not be construed as reaching any ex post facto legislation that may in the meantime be enacted.

Entries will be made accordingly